**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FRAMETECH LLC, | |
| Plaintiff, | Civil Action No. 4:23-cv-03837 |
| | JURY TRIAL DEMANDED |
| vs. | |
| | **MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)** |
| BMC SOFTWARE, INC., | |
| Defendant. | (Oral Argument Requested Under LR7.5.A) |

Defendant BMC Software Inc. ("BMC Software") respectfully moves for judgment on the pleadings under Rule 12(c). Plaintiff FrameTech LLC ("FrameTech") cannot state a plausible claim for relief because it is asserting a patent directed to implementing a well-known manual process using conventional computing components, which the U.S. Supreme Court has identified as patent-ineligible subject matter. More specifically, the claims in the asserted patent are directed to automating the manual steps that mainframe programmers use to upgrade mainframe operating systems. FrameTech is thus improperly trying to preempt using conventional computers to perform those well-known steps, in direct contravention of 35 U.S.C. § 101 and Supreme Court precedent. BMC Software therefore seeks an adjudication on the pleadings that the claims are directed to patent-ineligible subject matter and a dismissal with prejudice.

## I.      NATURE AND STAGE OF THE PROCEEDING

On July 13, 2023, FrameTech sued BMC Software in the Western District of Texas, Waco Division, alleging that BMC Software infringes at least claim 1 from U.S. Patent No. 7,194,737 ("the '737 Patent"). ECF No. 1 (Compl.); ECF No. 1-2 (Infringement Chart). FrameTech's predecessor-in-interest, Comserve Solutions LLC, previously sued BMC Software in the Western District of Texas, asserting the same claim from the same patent. *See Comserve Sols. LLC v. BMC*

1

*Software, Inc.*, No. 6-21-cv-00911 (W.D. Tex. filed Sept. 2, 2021). However, Comserve filed a voluntary dismissal in that action after reviewing evidence from BMC Software that the '737 Patent claims are invalid, including as they are directed to patent-ineligible subject matter under 35 U.S.C. § 101. Although BMC Software has communicated this history to FrameTech, it has refused to dismiss and pressed forward with this action, litigating objectively baseless claims.

On September 12, 2023, BMC Software filed an unopposed motion to transfer this case from the Western District of Texas because that was an improper venue. ECF No. 10. BMC Software filed its Answer on September 22. ECF No. 11. On October 10, the Western District of Texas granted BMC Software's motion to transfer the case to this Court. ECF No. 12.

## II.    FACTUAL BACKGROUND

The '737 Patent issued on March 20, 2007, from an application filed on October 2, 2002. ECF No. 1-1 ('737 Patent) at 1. The title explains that the patent is directed to a "system and method for expediting and automating mainframe computer setup." *See id.* (emphasis omitted). The specification describes the invention consistent with the title as one directed to automating the process for upgrading operating systems on mainframe computers:

> The present invention preferably automates mainframe computer operating system upgrades by automatically installing a base operating system on the mainframe system, performing information-gathering of an existing mainframe computer system, using the information to recreate the environment settings of the existing system, and providing a series of directives typically required of a skilled mainframe computer systems programmer for an IPL.[1]

*See id.* at Abstract, 3:65–4:1 ("The present invention preferably automates the mainframe computer operating system upgrade process by automatically employing a series of directives typically required of a skilled mainframe computer systems programmer.").

---

[1] The specification explains that an IPL is an "initial program load," a process "skilled technicians" undertake to load an operating system onto a mainframe computer. ECF No. 1-1 at 1:30–44.

2

According to the specification, skilled computer programmers in the prior art manually upgraded mainframe operating systems in the same way. *See, e.g.*, *id.* at Abstract (describing the invention as "providing a series of directives typically required of a skilled mainframe computer systems programmer"), 1:30–44 (explaining that upgrading mainframe operating systems is a task performed by "a skilled mainframe computer systems programmer"). The specification contends that this manual process was "complex and time-consuming." *Id.* at 1:39–42.

Recognizing the obvious—that computer automation could resolve some of the alleged complexities incidental to manual operating system upgrades—the patentee broadly claimed methods and systems for using generic computing components to perform the steps of collecting, generating, transferring, and applying configuration information that mainframe programmers otherwise performed manually. *See, e.g.*, *id.* at claim 1. But the claims do not recite any specific algorithm for performing those steps and instead broadly claim the manual steps when performed by conventional computing components, like client computers. *See id.*

After the '737 Patent issued, the U.S. Supreme Court clarified the standard for patent eligibility under 35 U.S.C. § 101, explaining that implementing a manual process using conventional computing components is a patent-ineligible concept. *See Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). No claims in the '737 Patent have been analyzed under the eligibility standard set forth in *Alice*.

### III. LEGAL STANDARDS

**A. Dismissal is appropriate when the complaint fails to state a plausible claim for relief.**

When considering a district court's grant of a motion to dismiss, the Federal Circuit applies the regional circuit's law. *See Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360 (Fed. Cir. 2023). In the Fifth Circuit, a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is subject to the same standards as a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6). *Morris v. PLIVA, Inc.*, 713 F.3d 774, 776 (5th Cir. 2013). "Judgments on the pleadings [under Rule 12(c)] are reviewed *de novo*." *Id.* To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Complaints that fail to state a claim upon which relief can be granted are to be dismissed as a matter of law. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss or motion for judgment on the pleadings, a court takes as true all well-pleaded factual allegations—but this "is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 663.

**B.     A complaint for patent infringement fails to state a plausible claim for relief when the patent claims are directed to patent-ineligible subject matter.**

Judgment on the pleadings is appropriate when there is no genuine dispute whether the claims are patent ineligible. *Trinity Info Media*, 72 F.4th at 1360 ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." (quoting *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)). Unless the patentee proposes a specific construction that must be resolved before the claims can be understood under Section 101, the Court may determine subject-matter eligibility on the pleadings. *Id.* at 1360–61 ("the patentee must propose a specific claim construction or identify specific facts that need development and explain why those circumstances must be resolved before the scope of the claims can be understood for § 101 purposes").

**C.     A claim is directed to patent-ineligible subject matter when it (1) is directed to an abstract idea and (2) lacks an inventive concept beyond applying the abstract idea using generic computer components.**

The Supreme Court has explained that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216. *Alice* set forth a two-step test for determining

4

whether a claim is directed to ineligible subject matter.

*Alice* **Step One.** The first step is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts," e.g., an abstract idea. *Id.* at 217. "*Alice* step one presents a legal question that can be answered based on the intrinsic evidence" and "does not require an evaluation of the prior art or facts outside of the intrinsic record." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372–74 (Fed. Cir. 2020).

The step-one analysis often begins "with an examination of eligible and ineligible claims of a similar nature from past cases." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1295 (Fed. Cir. 2016). "Under this inquiry, [courts] evaluate the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. Int'l, Inc. v. IBG, LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (quotation omitted).

When a claim recites "a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem," the "functional nature of the claim confirms that it is directed to an abstract idea." *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016). This "essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016).

*Alice* **Step Two.** If a claim is directed to ineligible subject matter, the second step is to "determine whether [any] additional elements transform the nature of the claim into a patent-eligible application" by reciting "an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (quotations omitted). Even

if "the techniques claimed are groundbreaking, innovative, or even brilliant, … that is not enough for eligibility" when "the advance lies entirely in the realm of abstract ideas." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (quotations omitted). "What is needed is an inventive concept in the non-abstract application realm." *Id.* at 1168.

To the extent claims include nonabstract elements, they are still ineligible if they recite "well-understood, routine, conventional activities previously known to the industry." *Alice*, 573 U.S. at 225 (quotation omitted). The "inquiry is not whether the claimed invention as a whole is unconventional or non-routine" but "whether the claim limitations other than the invention's use of the ineligible concept to which it was directed were well-understood, routine and conventional." *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

**D.    Dismissal with prejudice is appropriate when amendment would be futile.**

District courts often provide plaintiffs with an opportunity to amend when granting judgment on the pleading, but dismissal with prejudice is appropriate if amendment would be futile. *See, e.g.*, *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 346 (5th Cir. 2021) (affirming dismissal with prejudice, as the "defect [in the pleading] cannot be cured").

## IV.    REPRESENTATIVE PATENT CLAIM

When considering whether a patent's claims are directed to an abstract idea, district courts need not analyze each claim individually. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Rather, district courts may consider representative claims when they "are 'substantially similar and linked to the same abstract idea.'" *See id.* For this purpose, additional limitations based on "well-known, routine, and conventional functions" do not differentiate a claim from the representative claim, because simply making a claim narrower in scope is not a difference that "transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." *See id.* at 1349.

Here, claim 1 is representative of the other '737 Patent claims. FrameTech alleges that claim 1 is exemplary—i.e., representative. *See* ECF No. 1 ¶ 11 (alleging infringement of "the exemplary claims of the '737 Patent" in the claim chart attached to the complaint); ECF No. 1-2 (the referenced claim chart) (asserting only claim 1). This allegation is consistent with the '737 Patent. Claims 1 and 11 are the only independent claims, and they are substantially the same. Whereas claim 1 is directed to "a method for upgrading an operating system on a mainframe computer system," claim 11 is directed to "a system" for the same purpose. Claim 11 thus simply describes a system for performing the method from claim 1, such that both otherwise recite essentially identical limitations, as illustrated by the color-coded chart below:

| '737 Patent, Claim 1 | '737 Patent, Claim 11 |
|---|---|
| 1. A method for upgrading an operating system on a mainframe computer system, said method comprising: | 11. A system for upgrading an operating system on a mainframe computer system, said system comprising: |
| automatically receiving source profile information, said source profile information representing an existing configuration of at least one of hardware and software on said mainframe computer system; | a base operating system, said base operating system comprising a predefined configuration of operating system software components for said mainframe computer system; |
| using a client computer system to generate a base operating system, said base operating system comprising a configuration of operating system software components for said mainframe computer system, wherein the client computer system communicates with said mainframe computer system over a communication network; | a base operating system transfer module, wherein said a base operating system transfer module transmits said base operating system from a client computer system to said mainframe computer; |
| transferring said base operating system from said client computer system to said mainframe computer; and | a source profile information receiving module, said source profile information receiving module receives source profile information, said source profile information represents an existing configuration of at least one of hardware and software comprising said mainframe computer system; and |
| using the client computer system to automatically customize said base operating system comprising said mainframe computer | a customizing module, said customizing module modifies said base operating system on said mainframe computer system to |

| | |
|---|---|
| system to incorporate elements in said source profile information, wherein after said base operating system is customized, said mainframe computer system is automatically adapted for an initial program load. | incorporate elements in said source profile information, wherein after said base operating system is customized, said mainframe computer system is automatically adapted for an initial program load. |

As the above chart shows, claim 11 recites substantially the same limitations as claim 1, except for quasi-structural nonce elements of the system that perform the claim 1 method ("a base operating system transfer module," "a source profile information receiving module," and "a customizing module"). As these elements cannot provide the requisite inventive concept, they do not differentiate claim 11 from claim 1 for the purposes of Section 101 analysis. *See Content Extraction*, 776 F.3d at 1348 ("the mere recitation of a generic computer [element] cannot transform a patent-ineligible abstract idea into a patent-eligible invention").

The claims that depend from claims 1 and 11 similarly only introduce well-known, conventional elements and steps that likewise do not differentiate them from claim 1 for the purposes of subject-matter eligibility. For instance, claims 2–4, 8, 10, 12–14, and 20 recite installing or using generic computer functionality (e.g., providing for printing, storage, or retrieval of software; installing optional software packages, like DB2 or WebSphere) or generic computer storage (e.g., storage volumes or CD-ROMs).

Claims 5–7, 9, and 15–19 likewise recite repeating steps from the independent claims or performing other abstract acts, like evaluating or customizing information. *See, e.g.*, *In re Morsa*, 809 F. App'x 913, 917 (Fed. Cir. 2020) ("We have explained that claims related to 'customizing information based on (1) information known about the user and (2) [specific] data' are directed to abstract ideas."); *In re Rosenberg*, 813 F. App'x 594, 596 (Fed. Cir. 2020) (holding claims abstract that are directed to evaluating changes in data).

8

As this suggests, if the independent claims are directed to an abstract idea, the above limitations in the dependent claims cannot transform them into patent-eligible concepts. *See Content Extraction*, 776 F.3d at 1348 ("the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"), 1349 ("while these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea"). Claim 1 is thus representative of the remaining claims.

## V.    ARGUMENT

**E.    FrameTech has failed to state a plausible claim for relief because the '737 Patent's claims are directed to patent-ineligible subject matter.**

The '737 Patent's representative claim 1 is directed to using conventional computing components to automate otherwise-manual steps involved in upgrading a mainframe operating system. Claim 1 (and all the other claims) issued years before the U.S. Supreme Court announced the standard for determining patent eligibility in *Alice*, which clarified that using conventional computing components to automate otherwise-manual tasks that humans performed was a patent-ineligible concept. Under the *Alice* standard, which the U.S. Patent and Trademark Office never applied during the '737 Patent's prosecution, its claims are patent ineligible, including for the reasons described below.

### 1.  *Alice* Step One: the claims are directed to the abstract idea of automating the upgrade of an operating system.

The *Alice* Step One inquiry includes (i) determining the claimed advance over the prior art when considering the claims as a whole; (ii) examining how courts have evaluated similar claims; and (iii) for computer-based claims, evaluating whether the claims are directed to an improvement to computer functionality or simply use computers as a tool for implementing the abstract idea. *See, e.g., Trading Techs. Int'l, Inc.*, 921 F.3d at 1384; *Amdocs (Isr.) Ltd.*, 841 F.3d at 1295; *Credit*

9

*Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017). That inquiry leads to the conclusion here that the '737 Patent's claims are directed to the abstract idea of automating the upgrade of an operating system.

> ### i. The focus of the purported advance over the prior art in the '737 Patent is automating the upgrade of an operating system.

Representative claim 1 breaks into essentially four parts:

> 1. obtaining existing configuration information about a mainframe computer (e.g., "automatically receiving source profile information, said source profile information representing an existing configuration of at least one of hardware and software on said mainframe computer system");
>
> 2. generating new configuration information for the mainframe computer ("using a client computer system to generate a base operating system, said base operating system comprising a configuration of operating system software components for said mainframe computer system, wherein the client computer system communicates with said mainframe computer system over a communication network");
>
> 3. transferring the new configuration information to the mainframe computer ("transferring said base operating system from said client computer system to said mainframe computer"); and
>
> 4. applying the new configuring information on the mainframe computer ("said mainframe computer system is automatically adapted for an initial program load").

This breakdown is consistent with the specification, which describes the field of the invention as "using a personal computer to perform a remote and automated upgrade of a mainframe computer operating system." ECF No. 1-1 at 1:7–10. Specifically, it defines "the present invention" as "a system for upgrading an operating system on a mainframe computer system, including … transferring the base operating system to a mainframe computer system." *Id.* at 2:23–28.

Figure 2 (annotated, below) shows the preferred embodiment, which is consistent with claim 1. *See id.* at 2:62–63. Mainframe Computer System 2 (red) is connected via Global



Figure 2

Computer Network 8 (green) to Client Computer System 4 (blue). *See id.* at 4:9–45. Client Computer System 4 includes a CD-ROM Drive 6 (yellow) and storage, such as Database 12 (purple). A user on Client Computer System 4 uses software-control programs to gather configuration information about components that the user wants to install on Mainframe System 2. *See id.* Client Computer System 4 can then transfer the configuration information to Mainframe System 2 over Global Computer Network 8. *See id.* at 5:50–61.

The specification describes a prior-art system for upgrading a mainframe operating system



Figure 1

Prior Art

in reference to Figure 1 (annotated, left). *See id.* at 1:30–2:16. In this prior-art approach, Mainframe Computer System 2 (red) communicates with a Client System 4 (blue) over a network (not shown). This system requires "a skilled mainframe computer systems programmer" at the Client System 4 who is "capable of performing complex upgrades to the main frame computer operating system and environment"—i.e., a computer systems programmer able to manually perform the four general steps above of obtaining existing configuration information from Mainframe Computer System 2, generating new configuration information for Mainframe Computer System 2, transferring the new configuration information from Client 4 to Mainframe Computer System 2, and applying the new configuration information at Mainframe Computer System 2.

11

In sum, the purported improvement over the prior art is automating these otherwise-manual tasks. This is not just evident by comparing the claims to the prior art; the specification *explicitly* describes automation as the primary goal of the invention:

> **'737 Patent, 3:47-64**
>
> The present invention is concerned with mainframe computer systems. More particularly, the present invention is directed to providing an automated system and method for automating and simplifying the many complex steps associated with upgrading an operating system on a mainframe computer system. Secondarily, and separate from the present invention's primary concern with upgrading an operating

The specification is replete with recitations that the invention is directed to automating manual steps—starting with the title ("SYSTEM AND METHOD FOR EXPEDITING AND **AUTOMATING** MAINFRAME COMPUTER SETUP") and the Abstract:

> The present invention preferably **automates mainframe computer operating system upgrades** by automatically installing a base operating system on the mainframe system, performing information-gathering of an existing mainframe computer system, using the information to recreate the environment settings of the existing system, and **providing a series of directives typically required of a skilled mainframe computer systems programmer** for an IPL. By preparing a mainframe computer system to **automatically perform an IPL, and, thereafter, automating a series of configuration process** to install optional products, the present invention decreases the amount of time and operator skill-level requirements for prior art mainframe computer operating system upgrades.

*Id.* at 1 (emphases added), 3:65-4:1 ("The present invention preferably automates the main frame computer operating system upgrade process by automatically employing a series of directives typically required of a skilled mainframe computer systems programmer.").

Using computers to automate manual processes—such as automating operating-system upgrades—is an abstract idea. *See, e.g.*, *Credit Acceptance Corp.*, 859 F.3d at 1055 ("Our prior cases have made clear that mere automation of manual processes using generic computers does

not constitute a patentable improvement in computer technology."). Consistent with the claims, the stated goals of the invention, and the prior art described in the specification, the '737 Patent's claims are thus directed to the abstract idea of automating the upgrade of operating systems.

ii.    **The Federal Circuit and other district courts have found that similar claims are directed to abstract ideas.**

That the claims are directed to an abstract idea is evident from comparing the '737 Patent's claim language to similar claims that courts have found ineligible. *See Amdocs (Isr.) Ltd.*, 841 F.3d at 1295 (noting the analysis typically begins "with an examination of eligible and ineligible claims of a similar nature from past cases"). In *Tranxition, Inc. v. Lenovo (United States) Inc.*, for instance, the Federal Circuit considered claim 1 from U.S. Patent No. 6,728,877 ("the '877 Patent"). 664 F. App'x 968, 970 (Fed. Cir. 2016). That claim was directed to "computer system upgrades," including migrating settings from one computer to another. *See id.* at 969, 971–72. This was claimed in steps such as providing configuration information about the source computer, extracting configuration settings from the source computer, and transitioning the configuration settings from the source computer to a target computer. *See id.* at 972. The *Tranxition* Court held that "[this] claim is directed to the abstract idea of migration, or transitioning, of settings." *Id.*

As shown in the color-coded chart below, the same reasoning applies to claim 1 from the '737 Patent. The <span style="color:green">green</span> limitations describe obtaining existing configuration information about a destination computer. The <span style="color:blue">blue</span> limitations describe generating new configuration information for the destination computer. The <span style="color:red">red</span> limitations describe transferring (or preparing to transfer) the new configuration information to the destination computer. And the <span style="color:purple">purple</span> limitations describe applying (or preparing to apply) the new configuration information at the destination computer.

13

| '737 Patent, Claim 1 | '877 Patent, Claim 1 |
|---|---|
| 1. A method for upgrading an operating system on a mainframe computer system, said method comprising: | 1. A method in a computer system for preparing configuration settings for transfer from a source computing system to a target computing system, the method comprising: |
| automatically receiving source profile information, said source profile information representing an existing configuration of at least one of hardware and software on said mainframe computer system; | providing configuration information about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting; |
| using a client computer system to generate a base operating system, said base operating system comprising a configuration of operating system software components for said mainframe computer system, wherein the client computer system communicates with said mainframe computer system over a communication network; | generating an extraction plan that identifies configuration settings to be extracted from the source computing system, the generating including providing a list of configuration settings known to the source computing system and including identifying active configuration settings out of the provided list of configuration settings to be extracted from the source computing system; |
| transferring said base operating system from said client computer system to said mainframe computer; and | extracting the active configuration settings of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information; |
| using the client computer system to automatically customize said base operating system comprising said mainframe computer system to incorporate elements in said source profile information, wherein after said base operating system is customized, said mainframe computer system is automatically adapted for an initial program load. | generating a transition plan that identifies configuration settings to be transferred from the source computing system to the target computing system, the generating including providing active configuration settings of the extraction plan and including identifying from the active configuration settings of the extraction plan active configuration settings to be transferred from the source computing system to the target computing; and |
|  | for each active configuration setting of the transition plan, retrieving the extracted configuration settings identified as active configuration settings of the transition plan; and |

14

| | transitioning one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system. |
|---|---|

Like the '877 Patent in *Tranxition*, the claims here generally describe the concept of migrating software configurations.

The remaining limitations (highlighted in yellow)—upgrading operating systems, communicating over a network, and automatically adapting (i.e., updating) computers—are also concepts that courts have identified as abstract ideas. In *Personalized Media Communications, LLC v. Amazon.com, Inc.*, for example, the claims that were held abstract recited a method for upgrading operating systems that includes determining which "operating system instructions" are in use on a remote system and, if needed, communicating new operating-system instructions to replace them. 161 F. Supp. 3d 325, 331 (D. Del. 2015), *aff'd*, 671 F. App'x 777 (Fed. Cir. 2016). The concept of distributing updates to a computer system (e.g., automatically adapting the mainframe computer system in claim 1) has been held abstract. *See Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356, 366 (D. Del. 2015) ("As such, the court concludes that the claims are directed to the abstract idea of distributing software updates to a computer."). The Federal Circuit has also confirmed that "communication over a network" is abstract. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019).

As these analogous cases confirm, the '737 Patent's claims are directed to an abstract idea under *Alice* Step One—automating the upgrades of operating systems.

### iii. The claims simply automate a manual human process and thus do not provide an improvement to computer technology itself.

The abstract nature of the claims is further evident from the fact that they are focused on using computers as a tool for automation, not on improving computer technology itself. The

Federal Circuit has "made clear that mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance Corp.*, 859 F.3d at 1055. Such situations arise when "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Id.* (quoting *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)).

Here, the specification plainly states that the invention is directed to using computers as a tool for automating the manual process of upgrading operating systems. *See, e.g.*, ECF No. 1-1 at Abstract ("The present invention preferably automates mainframe computer operating system upgrades by automatically installing a base operating system on the mainframe system, performing information-gathering of an existing mainframe computer system, using the information to recreate the environment settings of the existing system, and providing a series of directives typically required of a skilled mainframe computer systems programmer for an IPL.").

The stated goals of the invention are not related to improving the functioning of the mainframe computer but rather to decreasing the workload and necessary skill level for the human programmers who would otherwise perform these tasks manually:

> By preparing a mainframe computer system to automatically perform an IPL, and, thereafter, automating a series of configuration process to install optional products, **the present invention decreases the amount of time and operator skill-level requirements for prior art mainframe computer operating system upgrades**.

ECF No. 1-1 at Abstract (emphasis added), 4:5–8 (same), 5:12–20 ("Absent the steps and processes described herein, a skilled mainframe computer systems programmer is required to enable a mainframe computer system 2, using just the base operating system, to successfully IPL the mainframe computer system 2. The skilled systems programmer is required to combine processes included in the base operating system and, moreover, to provide complex details directed

to the mainframe computer system 2 to perform an IPL.").

In fact, the specification is crystal clear that the primary problem the invention is trying to solve by automating the operating-system upgrades is human, not technical—a perceived shortage of programmers sufficiently skilled to perform these tasks manually. *See id.* at 3:65–4:8 (describing a shortage of programmers as "increasingly problematic over time"). But "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." *Credit Acceptance Corp.*, 859 F.3d at 1057. This is true because "merely 'configur[ing]' generic computers in order to 'supplant and enhance' an otherwise abstract manual process is precisely the sort of invention that the *Alice* Court deemed ineligible for patenting." *Id.* Applying general computing components to automate operating-system upgrades for the purpose of lessening the need for skilled programmers is thus not an improvement to computer functionality that would remove the claims from the realm of an abstract idea under *Alice* Step One.

**2.** ***Alice* Step Two: Because the claims simply implement the abstract idea by using conventional computer components, the claims lack an inventive concept that amounts to more than claiming the abstract idea itself.**

The '737 Patent's claims fail under *Alice* Step Two. As the representative claim is directed to an abstract idea, the claims in the '737 Patent are patent ineligible unless they add an "inventive concept" that ensures the patent amounts to more than a patent on the abstract idea itself. *See Alice*, 573 U.S. at 222. Transforming an abstract idea into a patent-eligible claim "requires more than simply stating the abstract idea while adding the words 'apply it.'" *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 891 (Fed. Cir. 2019). Rather, the claim "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Alice*, 573 U.S. at 221. The additional features must be more than a "well-understood, routine, conventional activity" previously known in the art. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 79 (2012).

In *Interval Licensing LLC v. AOL, Inc.*, the Federal Circuit explained that claims fail to provide an inventive concept when "recited at a high level of generality" because those "are not the kinds of limitations we have held to 'solve a technology-based problem, even with conventional, generic components, combined in an unconventional manner.'" 896 F.3d 1335, 1347 (Fed. Cir. 2018) (quoting *Amdocs (Isr.) Ltd.*, 841 F.3d at 1300). This is so because the claims in *Interval Licensing* did not "offer a particular solution to a [computer] problem"—they simply appended "rote conventional activity" to the abstract idea. *See id.* at 1347–48. The *Interval Licensing* reasoning holds true here. This is so because, as explained below, the '737 Patent's claims are likewise broadly drafted in results-oriented terms to apply the abstract idea by using generic computing components for their traditional purpose—which amounts to nothing more than preempting the long-standing process of upgrading operating systems when it is accomplished using conventional computing components.

At *Alice* Step Two, "[t]he use and arrangement of conventional and generic computer components recited in the claims—such as a database, user terminal, and server—do not transform the claim, as a whole, into 'significantly more' than a claim to the abstract idea itself." *Credit Acceptance Corp.*, 859 F.3d at 1056. Representative claim 1 recites a handful of conventional components to automate the operating-system upgrades: an operating system, a mainframe computer system, and a client computer system. *See* ECF No. 1-1 at 12:50–13:3. As the below chart demonstrates, the specification confirms that each is a conventional computing component:

| Claim Element | Specification Description |
| --- | --- |
| operating system | Standard mainframe operating systems, such as IBM OS/390 or z/OS. *See id.* at 1:14–21, 4:34–45, 6:37–40, 10:50–53. |
| mainframe computer system | "Mainframe computer system 2 and client computer system 4 are typical devices suitable for performing the functions required of host and client systems, respectively. … |

|  | Mainframe computer system 2 is <u>a mainframe computer system, for example, an IBM System 90</u>." *Id.* at 4:20–27 (emphases added). |
| --- | --- |
| client computer system | "Mainframe computer system 2 and <u>client computer system</u> 4 are <u>typical devices</u> suitable for performing the functions required of host and client systems, respectively. For example, each <u>client computer system 4 is a personal computer device</u> capable of accessing a global computer network 8, such as the Internet." *Id.* at 4:20–27 (emphases added). |

The '737 Patent's claims recite these components performing their traditional purposes—e.g., the client computer system is generating information and transmitting it to the mainframe computer system, and the mainframe computer system is receiving transmissions from the client computer system and receiving an initial program load. In sum, the computing elements recited in the claims are nothing more than conventional, well-known components that are performing their traditional roles in implementing the abstract idea of automating the upgrade of operating systems.

As explained in *Credit Acceptance Corp.*, simply automating an abstract idea by using conventional computing components is insufficient to transform the claim into something more than a claim on the abstract idea itself, in part because it seeks to preempt the use of well-known manual processes when they are implemented using conventional computing components. Such is the case here, when the '737 Patent's claims, if valid, would preempt performing the well-known manual steps of upgrading a mainframe operating system when performed using conventional computers. The claims are therefore patent ineligible because they fail under *Alice* Step Two, and FrameTech's Complaint should be dismissed because it accordingly fails as a matter of law.

**F.    Dismissal with prejudice is appropriate because amendment would be futile.**

It is appropriate to dismiss a complaint with prejudice when amendment cannot cure the defect. *See HCB Fin. Corp.*, 8 F.4th at 346. Here, dismissal is predicated on the fact that the asserted patent itself is invalid as a matter of law because its claims are directed to patent-ineligible

subject matter, which renders any amendment futile:

> [T]he Asserted Patents were necessarily invalid, as the claims therein were targeted at inherently patent-ineligible subject matter. … Dismissal on the pleadings without leave to amend was therefore appropriate, as leave to amend would only allow Plaintiff to change its complaint, and not the contents of the Asserted Patents.

*Data Scape Ltd. v. W. Digital Corp.*, 2019 WL 6391616, at *3 (C.D. Cal. July 12, 2019), *aff'd*, 816 F. App'x 461 (Fed. Cir. 2020). The Court should accordingly dismiss with prejudice.

## VI.    CONCLUSION

The claims in the '737 Patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101, and FrameTech cannot correct this by amending the Complaint. The Court should therefore grant judgment on the pleadings in BMC Software's favor and dismiss with prejudice.

**DATED:** October 13, 2023                    Respectfully submitted,

*/s/ William M. Logan*

William M. Logan, Attorney-in-Charge
Texas Bar No. 24106214
S.D. Texas Bar No. 3267185
wlogan@winston.com
**WINSTON & STRAWN LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600
Fax: (713) 651-2700

E. Danielle T. Williams
North Carolina Bar No. 23283
*Pro Hac Vice* Forthcoming
DWilliams@winston.com
**WINSTON & STRAWN LLP**
300 S. Tryon Street, 16th Floor
Charlotte, NC 28202
Phone: (704) 350-7790
Fax: (704) 350-7800

**ATTORNEYS FOR DEFENDANT BMC SOFTWARE, INC.**

**ORAL ARGUMENT REQUEST**

Pursuant to LR7.5.A, BMC Software believes oral argument would be helpful for the Court on the issues presented in this Motion. Consistent with the Court's Procedure 5, which encourages speaking opportunities for lawyers practicing for fewer than seven years, if the Court grants oral argument, BMC Software intends to allow a lawyer with less than seven years of experience present oral arguments on this Motion at the hearing.

**CERTIFICATE OF SERVICE**

I certify that consistent with LR5.1 all counsel of record who have appeared in this case are being served a copy of the foregoing via the Court's CM/ECF system on October 13, 2023.

/s/ *William M. Logan*
William M. Logan